## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SATURN WIRELESS
CONSULTING, LLC,

        **Plaintiff,**

    **v.**

FRANK AVERSA,

        **Defendant.**

Civ. No. 17-1637 (KM/JBC)

**OPINION
(REDACTED)**

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

    This matter comes before the Court on the application by order to show cause (ECF no. 3) of the plaintiff, Saturn Wireless Consulting, LLC ("Saturn"), for a preliminary injunction. Saturn asks this Court to enjoin its ex-employee, defendant Frank Aversa, from soliciting, contacting, or otherwise interfering with Saturn's customer AT&T. The action is one for breach of a written contract containing a restrictive non-solicitation covenant.[1]

    On Friday, March 10, 2017, I denied Saturn's request for a temporary restraining order but ordered expedited discovery and set the matter down for a preliminary injunction hearing. On March 31st and April 3rd, 2017, I held an evidentiary hearing. The court heard live testimony from two witnesses: Manika Sood, who testified on behalf of Saturn, and Frank Aversa, who testified on his own behalf. By the parties' stipulation, I accepted affidavits from witnesses in lieu of direct testimony. Sood and Aversa were cross-examined and also gave re-direct

---

[1]    This Court exercises jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.

testimony. The parties submitted documentary exhibits, as well as deposition designations.

For the reasons set forth below, the Court is persuaded that Saturn has met its burden of showing that injunctive relief is warranted, although not to the extent requested. Subject to the Court's "blue pencil" modifications to the non-solicitation provision, Saturn's motion for a preliminary injunction enforcing that provision will be GRANTED.

## I.    FINDINGS OF FACT[2]

### A. Saturn's Business

1. Saturn is a New Jersey-headquartered Limited Liability Company in the business of providing wireless communications support and training, and selling accessories to complement wireless devices. (Sood Cert. ¶¶ 1–2)

---

[2]    Certain record items repeatedly cited are abbreviated as follows:

Compl. = Verified Complaint, filed March 10, 2017 (ECF No. 1).

Aversa Decl. = Declaration of Frank Aversa, dated March 24, 2017, submitted in opposition to Saturn's order to show cause for a temporary restraining order and preliminary injunction (ECF No. 12).

Sood Cert. = Certification of Manika Sood, dated March 24, 2017, submitted in support of Saturn's order to show cause for a temporary restraining order and preliminary injunction (ECF No. 14).

Ex. P_ = Plaintiff's Exhibit, entered into evidence at the preliminary injunction hearing, held March 31, 2017 and April 3, 2017.

Ex. D_ = Defendant's Exhibit, entered into evidence at the preliminary injunction hearing, held March 31, 2017 and April 3, 2017.

Restrictive Agreement = Sales Representative Confidentiality, Non-Solicitation, and Non-Compete Agreement between Saturn and Aversa, Ex. P2, also Compl. Ex. A (ECF No. 1).

Alliance Agreement = Saturn's AT&T Alliance Program Agreement with AT&T, Ex. D1, also Sood Cert. Ex. A (ECF No. 14).

Pl. Br. = Application/Brief in Support of Plaintiff's Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction by Saturn Wireless Consulting, LLC (ECF No. 3).

Def. Opp. = Brief in Opposition to Plaintiff's Order to Show Cause for a Preliminary Injunction (ECF No. 10).

2. Since 2001, Saturn has been a Solutions Provider for AT&T (an "AT&T SP").

3. The AT&T Alliance Program Agreement between AT&T and Saturn (the "Alliance Agreement"), signed in December 2013 and effective as of January 1, 2014, sets forth the terms and conditions of AT&T's relationship with Saturn. (*See* Alliance Agreement.)

4. The Alliance Agreement defines a "Customer" as a ███████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████. (*See* Alliance Agreement §1)

5. The Alliance Agreement defines Saturn, for purposes of the Alliance program, as ███████████████████████ (*Id.* § 4.1)

6. Additionally, the Alliance Agreement includes a non-exclusivity provision, which provides that ███████████████████████ ████████████████████████████████████████ ██████████████████████████ (*Id.* § 4.3)

7. Under the Alliance Program and Agreement, AT&T refers businesses that subscribe to AT&T's wireless network ("AT&T end-users") to Saturn for support services. Saturn then provides products and services to those referred AT&T end-users in exchange for compensation paid by AT&T. (Sood Cert. ¶ 2)

8. For example, Saturn receives a commission from AT&T when it helps an AT&T end-user activate a new line of service from AT&T. (*Id.* ¶ 14)

9. AT&T and Saturn consider this relationship, pursuant to AT&T's Alliance Program, to be a business "partnership."

10. Because AT&T compensates Saturn for the services it provides to AT&T end-users, Saturn also considers AT&T a customer or client of Saturn. And, because Saturn provides services and products directly to the AT&T end-users, it considers those businesses to be customers

or clients of Saturn as well. (*Id.* ¶ 15)

11. Saturn derives 95% of its business from the referrals it gets from AT&T. Saturn's relationship with AT&T is therefore critical to its continued viability. (*Id.* ¶¶ 5, 14, 39)

12. Saturn's relationship with AT&T is also critical because Saturn must compete for AT&T's referrals against hundreds of other AT&T SPs throughout the country. (*Id.* ¶ 16; Aversa Decl. ¶ 12)

13. Saturn builds and maintains its relationship with AT&T by fostering individual relationships and goodwill between Saturn's Regional Account Managers ("RAMs") and AT&T sales representatives. (Sood Cert. ¶ 2)

14. AT&T employs a hierarchy of sales representatives, e.g., officers, general managers, sales executives, and sales consultants. (Aversa Decl. ¶ 18) The AT&T employees who serve as the primary liaisons between AT&T and its SPs are called Channel Managers. (*Id.* ¶ 16)

15. As Saturn's CEO, Manika Sood testified credibly that "Saturn's relationships with AT&T sales representatives have been cultivated through more than 15 years of relationship building, travel, entertainment, in-person meetings, the provision of prompt and accurate service and the preparation of marketing materials to promote the unique services that Saturn provides to its customers." (*Id.* ¶ 16)

16. Sood also represented that "Saturn is . . . one of the only [AT&T SPs] that provides full end-to-end solutions for corporate customers looking for wireless services including, by way of example and without limitation, orders processing, buyback of used equipment, non-stocked devices that AT&T does not carry, professional services and mobility consulting." (*Id.*)

17. Saturn's success has led AT&T to honor Saturn as a "platinum champion" partner for several years running, most recently in 2017.

(*Id.* ¶ 16 & Ex. C)

18. In recent years, Saturn has employed between five and six RAMs to build and maintain relationships with and sell Saturn's services to AT&T sales representatives, with each RAM having responsibility for several neighboring states in the United States. (*Id.* ¶¶ 3, 16)

### B. Aversa's Employment By Saturn And Restrictive Agreement with Saturn

19. Saturn hired Aversa as a RAM on August 16, 2013, giving him responsibility for sales in Alabama, Florida, Georgia, Louisiana, North Carolina, South Carolina and Tennessee (the "Greater Southeast") through December 2014. Beginning in January of 2015, however, his territory was reduced to Florida, Louisiana and Alabama (the "Southeast") (Sood Cert. ¶ 3)

20. Before accepting his position with Saturn, Aversa worked for Verizon Wireless from 2001 to 2006, and then for Chase Bank. (Aversa Decl. ¶¶ 5–6) He had general sales and wireless experience before coming to Saturn, but no experience with the AT&T Alliance program or relationships with AT&T sales representatives.

21. As a condition of employment, on August 1, 2013, Aversa entered into a Confidentiality, Non-Solicitation, and Non-Compete Agreement with Saturn (the "Restrictive Agreement"), which contains a New Jersey choice of law provision. (*See* Restrictive Agreement ¶ 12)

22. Aversa signed the Restrictive Agreement. Before signing, he was given the opportunity to, and did, read the Restrictive Agreement. He was also given the opportunity to have an attorney review the Restrictive Agreement.

23. The Restrictive Agreement prohibits Aversa from disclosing any of Saturn's confidential information to any third party, "except for the benefit of [Saturn] and in the course of Employee's employment with [Saturn]." It also prohibits Aversa from retaining or disclosing any "written or other tangible material" containing confidential

information in the event his employment with Saturn ceases for any reason. (*Id.* ¶ 1(b)&(c))

24. The Restrictive Agreement defines Saturn's confidential information as follows:

> Confidential Information generally includes any and all information concerning products and pricing; pricing methods; **existing customer and prospective customer lists, budgets, needs, and preferences; information relating to services used and preferred by [Saturn's] clients and prospective clients; historical sales information;** supplier and vendor agreements; market research; policies and other terms of business; marketing practices; advertising strategies; unpublished financial data; methods of operation; pending proposals; business plans; processes; computer software used or to be used by [Saturn]; computer data information; information concerning [Saturn]'s employees; proprietary training materials; and any trade secrets or intellectual property. **Employee specifically acknowledges that [Saturn]'s customer relationships were developed over many years, at great expense and effort by [Saturn], and as a result of [Saturn]'s relationships with its vendors, customers, agents and their respective employees, and that such relationships are deemed to be protected Confidential Information.**

(Restrictive Agreement ¶1(a) (emphases added))

25. The Restrictive Agreement also contains a non-solicitation provision, which provides, in relevant part:

> As a specific condition of Employee's employment with [Saturn] and in consideration of the salary and other compensation paid by [Saturn] to Employee, Employee agrees that, from the date hereof and during Employee's employment with [Saturn], and for one (1) year immediately after Employee's employment with [Saturn] ceases, regardless of whether the termination of Employee's employment is initiated by [Saturn] or by Employee, is for cause or without cause, Employee will not directly or

indirectly: . . . (iii) **knowingly contact or solicit, either directly or indirectly, any person, firm or entity connected with [Saturn], including its customers, clients, vendors, or suppliers for the purpose of diverting work or business from [Saturn].**

(*Id.* ¶2 (emphasis added))

26. Additionally, the Restrictive Agreement contains a covenant not to compete, which provides, in relevant part:

> As a specific condition of Employee's employment with [Saturn] and in consideration of the salary and other compensation paid by [Saturn] to Employee, Employee agrees that, from the date hereof and during Employee's employment with [Saturn], and for one (1) year immediately after Employee's employment with [Saturn] ceases, regardless of whether the termination of Employee's employment with [Saturn] is initiated by [Saturn] or by Employee, is for cause or without cause, **Employee shall not, directly or indirectly: a) provide any services to** (whether as an employee, agent, consultant, contractor, proprietor, partner, manager, officer, director, stockholder, investor, advisor, or otherwise), b) **have any ownership interest in, or c) participate in**, either directly or indirectly, the financing, operation, management, or control of: **any person, sole proprietorship, firm, corporation, trust, joint venture, or other business or entity that engages in a "Restricted Business" in a "Restricted Territory,"** as such terms are defined below.

> . . . .

> The term "Restricted Business" **shall mean any business . . . providing services that are similar or related to the services provided by [Saturn]. Specifically, this term encompasses any and all businesses . . . whose business objective, in whole or in part, is to provide integrated wireless solutions, services, products, support, and/or products to business customers through coordination and partnering with telecommunications companies,** software

applications providers and hardware providers.

. . . .

The term "Restricted Territory" shall mean the territory within **a 50-mile radius of [Saturn]'s Jersey City headquarters, or the territory within a 50-mile radius of any location at which [Saturn] may hereafter maintain its headquarters**.

(*Id.* ¶3 (emphases added))

27. The Restrictive Agreement further provides:

> Employee acknowledges that should Employee breach any of the provisions of Sections 1, 2, or 3, [Saturn] will suffer immediate and irreparable harm and that money damages will be inadequate relief. Therefore, Employee agrees that in the event that Employee **breaches or threatens to breach any of the provisions of Sections 1,2, or 3, [Saturn] shall be entitled to: (i) injunctive relief enjoining Employee from committing or continuing to commit any violation of this Agreement,** and employee consents to the issuance by a court of competent jurisdiction of a temporary restraining order, preliminary or permanent injunction to enforce its rights under this Agreement; and (ii) recovery from Employee of all gross profit earned by the business entity on whose behalf Employee conducted such activity in violation of Sections 1,2, or 3. [Saturn] shall also be entitled to seek any other damages or remedies available under law, in equity, or by statute.

(*Id.* ¶5 (emphasis added))

28. Additionally, the Restrictive Agreement provided that, in the event of Aversa's termination, whether voluntary or not, he was to immediately and without request surrender to Saturn all Saturn equipment, documents, and data, including his cell phone and laptop computer. (*See id.* ¶ 1(b))

29. The Restrictive Agreement contains the following warning on the last

page, just above where Aversa and Saturn signed: **"CAUTION: THIS AGREEMENT RESTRICTS EMPLOYEE'S RIGHTS TO COMPETE WITH [SATURN] AND DISCLOSE OR USE [SATURN'S] CONFID[EN]TIAL INFORMATION DURING AND SUBSEQUENT TO EMPLOYEE'S EMPLOYMENT. EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS. . . ."** (*Id.* p.5)

30. Early in Aversa's employment with Saturn, Saturn flew him from his Florida home to New Jersey for an orientation. By Aversa's account this consisted of little more than having him shadow another Saturn employee. Aversa says his real training occurred through online learning modules that AT&T provided for free to AT&T SPs and which taught him about AT&T systems, products, and services. (*Id.* 18)

31. By Sood's account, Aversa's training was more extensive, and involved teaching Aversa everything he knows about the wireless business, wireless systems and services, Saturn's products and unique solutions, relationship building, and sales and marketing. (Sood Cert. ¶¶ 17–21)

32. I accept factually that Aversa's job required him both to learn about AT&T's products and services, and to learn about Saturn's business methods.

33. Throughout Aversa's employment with Saturn, Sood introduced Aversa to AT&T sales representatives, often making trips to Aversa's Southeast territory for that purpose. (Sood Cert. ¶¶ 17, 19–20)

34. Aversa emphasizes the role of AT&T Channel Managers, who, at the request of AT&T SPs, would furnish names and contact information for AT&T sales representatives, which led to the building of relationships. (Aversa Decl. ¶ 18; *see also* Ex. D3)

35. Again, I accept factually that Sood's introductions and preexisting relationships, as well as the AT&T SP's building of relationships, were important.

36. For the part of 2013 that Saturn employed Aversa, Aversa earned $18,478. In 2014, he earned $102,251. In 2015, he earned $86,874, and in 2016 (through November 15, when he left), he earned $66,988. (Sood Cert. ¶ 23)

### C. Aversa's Resignation and Formation of CCG

37. Aversa resigned from Saturn, giving two weeks' notice by letter to Sood, on November 15, 2016. (Sood Cert. ¶ 24 & Ex. G; Aversa Decl. ¶ 29)[3]

38. Aversa had used a cellphone for Saturn-related business. On that cellphone he had business-related contact information for, *inter alia*, AT&T sales representatives and AT&T end-users. (Aversa Decl. ¶ 33) The phone itself had not been issued to him by Saturn. When Aversa resigned, he "wiped" the cellphone clear (i.e., deleted all information Aversa had downloaded onto it and restored it to its default settings) and sold it. (*Id.*)

39. Aversa testified that he believed Sood deactivated his cellphone's SIM card, which would have cleared the cellphone of Saturn-related data unless that data was also stored on the cellphone's hard drive.

40. Aversa returned the laptop Saturn had provided to him. Before doing so, Aversa wiped the laptop of all files, programs, and materials he had downloaded or installed locally, and reinstalled the laptop's operating system. (*Id.* ¶ 34)

41. Aversa explained that he wiped his laptop because he had used the laptop for personal matters, in addition to Saturn-related matters, and wished to maintain his privacy. (*Id.*)

42. Wiping the laptop had the effect of deleting all local copies of e-mails

---

[3] Aversa testified that he resigned, in part, because he caught wind that Sood was committing fraud against AT&T and that for years she had been cheating Aversa out of his full commissions. (*See* Aversa Decl. ¶¶ 25–29) The Court declines to make any finding of fact as to these accusations, which, at least as presented here, are based on hearsay and are not substantiated.

from the laptop. (*Id.* ¶ 35)

43. Anyone at Saturn with administrative privileges, however, would have been able to access Aversa's deleted e-mails via Saturn's GoDaddy server, for a period of 60 days after Aversa deleted them.

44. After Aversa's resignation, Saturn appointed Greg Bocchino, who had previously taken over Georgia, North Carolina, South Carolina and Tennessee from Aversa in December 2014, to cover Aversa's Southeast territory. Since December 2016 or January 2017, Bocchino has been Saturn's RAM for the entire Greater Southeast region.

45. At some point around December 2, 2016, Aversa set up his own business. He created a limited liability company called Connected Communications Group ("CCG"), which has entered into a contract with AT&T to be an AT&T SP. Like Saturn, CCG specializes in wireless solutions "within the AT&T suite of products and services." Thus, CCG competes with Saturn. (Sood Cert. ¶ 25)

46. CCG competes primarily in Aversa's former Southeast region, *i.e.*, Florida, Alabama, and Louisiana, but also in Mississippi. (Def. Opp. 1)

47. CCG works with a company called Think Creative, another AT&T SP. Think Creative competes with Saturn as well as with CCG. Pursuant to CCG's partnership arrangement with Think Creative, under which CCG operates as a subcontractor of Think Creative, CCG receives 70–80% of the referral fees that Think Creative receives from AT&T.

48. CCG is also in the process of expanding its business in AT&T's wireline solutions space. (Aversa Decl. ¶ 41) The term "wireline" refers to non-wireless communications systems. (*Id.*) During Aversa's years of employment with Saturn, Saturn did not compete in the wireline space. (*Id.*)

49. Aversa denies that, post-resignation, he retained any copies of Saturn's confidential information, including contact information for AT&T sales representatives or AT&T end-users with whom he regularly worked. While Saturn has its suspicions, and points particularly to the "wiping" of the cell phone and laptop computer, there is as yet no affirmative evidence that Aversa retained such information. He testified that there are other means of obtaining such information, such as contact information for AT&T sales representatives and AT&T end-users serviced by Saturn.

50. It was established at the evidentiary hearing, for example, that while at Saturn, Aversa had subscribed to a cloud-based service that let him receive calls for at least two telephone numbers on his cellphone. One number was his official Saturn business phone number (the "404 number"), for which Saturn paid. The other was a number Aversa had set up in 2015 and paid for personally, but which he also used for Saturn business (the "561 number").

51. Aversa included both the 404 number and the 561 number in the signature block that appeared in his Saturn-related e-mails. Since leaving Saturn, he has continued to use the 561 number (but not the 404 number) in his signature block for CCG. The court concludes from this that Aversa's contacts while at Saturn might seamlessly continue to contact him at CCG using the 561 number.

52. On December 22, 2016, Aversa had contact with AT&T Channel Manager **A.J.** with whom Aversa had not worked while at Saturn. From **A.J.** he requested and received a list of the names and contact information for AT&T's current sales representatives in the Southeast. (*See* Ex. D3; Ex. P11 (Aversa Deposition Transcript)

pp. 158–59)

53. Aversa testified that he is also connected to many of his former Saturn contacts through LinkedIn.

54. Since Aversa's resignation from Saturn, Sood has been able to access and monitor new incoming emails to Aversa's old Saturn e-mail address.

55. On December 20, 2016, Sood intercepted an e-mail sent to Aversa's Saturn e-mail address. This included an e-mail thread between Aversa on behalf of CCG, AT&T sales representative **S.C.** and AT&T end-user **B.V** . (Sood Cert. ¶ 27 & Ex. D (also marked as Ex. P6)) Aversa had established a relationship with both **S.C.** and **B.V.** while at Saturn. (*Id.* ¶ 28; *see also* Ex. P7)

56. Sood intercepted another e-mail sent to Aversa's Saturn e-mail address on March 1, 2017. That e-mail demonstrated that **S.C.** had recently referred Aversa and CCG to provide services to an AT&T end-user company called **M.C.G.** . Although Saturn had never done business with this company, Sood believes Saturn would have received **S.C.'s** referral had Aversa still worked for Saturn at the time. (Sood Cert. ¶ 30)

57. In 2015, Saturn sales generated in Aversa's region were $███████. From January through November 15, 2016, Saturn sales in Aversa's region were $██████. Between November 15, 2016 (the date of Aversa's resignation) and late March, 2017, Saturn sales in Aversa's former region were $█████ (Sood Cert. ¶ 37)

58. Saturn attributes the post-November 15, 2016 drop in sales to Aversa's diversion of business from Saturn to CCG. (*Id.*) The court notes, however, that there had already been a precipitous drop from 2015–16, and that the lag in sales immediately after Aversa's resignation might be attributable in part to the interregnum between Aversa's resignation and Saturn's appointment of Bocchino to the

Greater Southeast region.

59. During expedited discovery in advance of the evidentiary hearing, Saturn produced lists of AT&T end-users within Aversa's Southeast region in 2015 and 2016 that generated business for Saturn. (*See* Exs. P3, P3A). These lists also identify the AT&T sales representatives that referred the business to Saturn. (*Id.*) (Exhibit P3 is organized by name of AT&T sales representative; Exhibit P3A consists of the same data, organized by name of end-user customer.)

60. Aversa, for his part, produced a list of AT&T customers with whom Aversa has commenced and/or completed business since leaving Saturn. (*See* Ex. P4) This list also indicates (1) whether Aversa has commenced and/or completed business on behalf of CCG alone or in conjunction with Think Creative; (2) the AT&T sales representative that referred Aversa to the AT&T end-user; and (3) an alternative referral source (i.e., someone who made the referral other than an AT&T sales representative), if any. (*Id.*)

61. As for alternative referrals, only one individual named    **J.J.** is listed.  **J.J.**    is no longer an AT&T sales representative, but was an AT&T sales representative while Aversa worked for Saturn. It was while working at Saturn that Aversa came to know

62. Of the 16 AT&T sales representatives listed on Exhibit P4 (Aversa's list of CCG business), all but two,     **T.C.**    and    **A.J.** , are individuals that Aversa came to know while working at Saturn. Specifically, Aversa met them through introductions made by Sood. (Ex. P11 pp. 158-59; Ex. P4)

63. Sood also introduced Aversa to the bosses of most, if not all of, the AT&T sales representatives listed on Exhibit P4.

64. Sood testified that Aversa is using Saturn's confidential business strategies, including technical solutions and strategies for positioning himself effectively with AT&T sales representatives so as to generate

referrals, which he learned at Saturn. Sood believes that he is using these strategies to divert business from Saturn to CCG and/or Think Creative. Sood was unable to point to any document on which the relevant allegedly confidential information is memorialized, or to articulate any specific confidential strategy. (*See* Ex. D12 (Sood Deposition Transcript) pp. 79:25–81:9, 106:9–107:1)

## II.   ANALYSIS/CONCLUSIONS OF LAW

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Because a preliminary injunction is "an extraordinary and drastic remedy," the plaintiff must establish each element by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)). Even then, a trial court's decision to issue a preliminary injunction is "an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006).[4]

A Court will consider all four factors, but the first two are essential. *See Adams v. Freedom Forge Corp.*, 204 F. 3d 475, 484 (3d Cir. 2000); *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable

---

[4]     A federal court confronted with a request for a preliminary injunction based on diversity jurisdiction applies the federal standard to the question of whether a preliminary injunction is warranted, pursuant to Fed. R. Civ. P. 65. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989).

harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir. 1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *American Express*, 669 F.3d at 366, 374. *But see Conestoga Wood Specialties Corp. v. Secretary of U.S. Dept. of Health and Human Services*, 724 F.3d 377 (3d Cir. 2013) (debating whether there is a "sliding scale" of the four factors).

Saturn argues that the four preliminary injunction factors weigh in its favor and that, pursuant to the non-solicitation provision in the Restrictive Agreement, this Court should enjoin Aversa from working with AT&T in any capacity for a period of one year. (*See, e.g.*, Compl. p.11) For the reasons explained below, I find that Saturn is entitled to injunctive relief, but not to the full scope of relief that it seeks.

### A. Likelihood of success on the merits

To show a likelihood of success, Saturn must establish "a reasonable probability, not the certainty, of success on the merits." *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980).

Saturn bring claims against Aversa for: (1) breach of contract; (2) misappropriation and conversion of trade secrets and confidential information; (3) actual and threatened misappropriation under the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1 *et seq.*; (4) breach of fiduciary duty and duty of loyalty; (5) unjust enrichment; and (6) unfair competition. (Compl.) Saturn also brings a seventh count seeking attorney's fees pursuant to Section 6 of the Restrictive Agreement. (*Id.*) The goal of Saturn's request for injunctive relief, however, is to prevent Aversa from breaching his Restrictive Agreement. I therefore focus my analysis on Saturn's breach of contract claim—specifically, with respect

to the non-solicitation provision in the Restrictive Agreement.[5]

In general, to establish a breach of contract claim, a plaintiff must demonstrate (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito,* 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).[6] The parties do not dispute that the Restrictive Agreement is a valid contract. Their disagreement focuses on the second prong: Aversa's alleged breach of the non-solicitation provision. Aversa argues that (1) the language of the non-solicitation provision does not prohibit him from conducting business as an AT&T SP, but rather, it forbids him only from soliciting Saturn's end-user customers for the narrow "purpose of diverting work or business from [Saturn]"; and (2) the non-solicitation provision is unenforceable, because it does not reasonably protect any legitimate interest of Saturn.

---

[5]     The non-compete provision of the Restrictive Agreement is geographically limited to a 50-mile radius around Saturn's New Jersey headquarters. (*See* ¶ 21, *supra*.) Although Saturn at first pressed a claim under the non-compete, it no longer seeks injunctive enforcement of that provision with respect to Aversa's current operations, which are primarily in the southeastern United States.

[6]     The parties seem to agree that New Jersey law applies in this diversity action, pursuant to the Restrictive Agreement's choice of law provision. (*See* ¶ 16, *supra*; Restrictive Agreement ¶ 12). "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state. Generally, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *Nuzzi v. Aupaircare, Inc.,* 341 F. App'x 850, 852 (3d Cir. 2009) (internal quotation marks omitted) (citing *Homa v. Am. Express Co.,* 558 F.3d 225, 227 (3d Cir. 2009)) Neither party contends that the choice of law provision in the Restrictive Agreement violates public policy, and I see no reason why it would (unless of course it were applied overbroadly). Therefore, I will apply New Jersey law as to the parties' dispute over the non-solicitation provision.

1.    *The non-solicitation provision forbids Aversa from doing business with AT&T sales representatives and end-user clients that are customers/clients of Saturn*

New Jersey courts tasked with interpreting a contract must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *State Troopers Fraternal Ass'n of New Jersey, Inc. v. State*, 149 N.J. 38, 47, 692 A.2d 519, 523 (1997). "Contracts should be read 'as a whole in a fair and common sense manner.'" *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118, 85 A.3d 947, 958 (2014) (quoting *Hardy ex rel. Dowdell v. Abdul–Matin*, 198 *N.J.* 95, 103, 965 A.2d 1165 (2009)). Thus, "[t]he court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" *Pacifico v. Pacifico*, 190 N.J. 258, 266, 920 A.2d 73, 77 (2007) (quoting *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 *N.J.* 293, 302, 96 A.2d 652 (1953)).

Aversa raises two arguments as to why the language of the non-solicitation provision does not restrict any of his business operations with CCG and Think Creative.

First, comparing the non-solicitation and non-compete provisions of the Restrictive Agreement, Aversa finds a sort of division of labor between the two. He argues that only the non-compete provision refers to doing business with "telecommunications companies" generally, while the non-solicitation provision is more specifically directed to solicitation of Saturn's "customers, clients, vendors, or suppliers." (Def. Opp. 15; *see* Restrictive Agreement §§ 2–3). Reading the Restrictive Agreement as a whole, Aversa concludes that the non-solicitation provision cannot have been intended to restrict Aversa from working with a telecommunications company such as AT&T. (Def. Opp. 14–15) This conclusion is reinforced, he claims, by the fact that Saturn commonly refers to AT&T as its partner, not its client or customer. (*Id.* 15–16; *see generally* Compl.; *see*

*also, e.g.*, Sood Cert. Ex. D pp. 000073–74, 000082–83, Ex. E p. 000131).[7] In short, Aversa submits that interpreting both the non-compete and non-solicitation provisions to restrict Aversa from doing business with AT&T would create redundancies in terminology and purpose, violating canons of contract construction. (*See* Def. Opp. 14–17)

The point is illustrated, says Aversa, by the cautionary language at the very end of the Restrictive Agreement, which specifically warns that the agreement restricts an employee's "right to compete" and to "disclose or use [Saturn's] confidential information." (*See* ¶ 29, *supra*) Aversa argues these two distinct warnings track the distinct purposes of the non-compete and non-solicitation provisions. The non-compete broadly restricts Aversa from engaging in the same business as Saturn (albeit locally), while the non-solicitation provision prevents an employee from diverting existing business from Saturn, for the narrow purpose of protecting confidential information.

In analyzing Aversa's argument, I rely primarily on the plain language of the contract, but also take into consideration the record evidence and findings of fact, *supra*, to discern its purpose. I think the non-solicitation covenant's phrase "any person, firm or entity connected with [Saturn], including its customers, clients, vendors, or suppliers" may fairly encompass (i) AT&T sales representatives; (ii) AT&T's end-user customers; and (iii) AT&T generally (i.e., as a company), but only within the context of the wireless Alliance Program. Sood testified credibly, and

---

[7]     At the evidentiary hearing, Aversa's counsel implied that the meaning of "customer" should be construed with reference to the Alliance Agreement, which defines customers as AT&T's end users and does not use the term in connection with AT&T's relationship with Saturn. But this goes too far. The Restrictive Agreement and Alliance Agreement govern the relationships between different parties, do not cross-reference one another, and contain merger clauses. There is simply no reason to conclude that the definition of terms in the Alliance Agreement, entered into in December 2013, informs those in the Restrictive Agreement, entered into earlier, in August 2013. And as a matter of common sense, the same person or entity might be a customer in the context of one relationship, but not another.

the exhibits support, that AT&T sales representatives fall within the plain meaning of "clients" and "customers." They engage the services of Saturn, and Saturn is paid a commission in exchange. The sales representatives may also be seen as "suppliers" of sales leads, although this is less certain. AT&T's end-user customers (i.e., the businesses to which Saturn directly provided solutions), too, fall within the plain meaning of clients or customers of Saturn. AT&T as a company, within the confines of the Alliance Program, is a vendor of products and a supplier of end-user customers for Saturn. (Restrictive Agreement § 2)[8]

Additionally, I read the language "for the purpose of diverting work or business from [Saturn]" to serve a limiting purpose. In light of Saturn's actual practices, this language restricts Aversa only from accepting referrals or any other form of business from the AT&T sales representatives with whom Saturn works or has worked, and from selling to or performing services for AT&T end-users that are current or past customers of Saturn. In other words, I do not read the non-solicitation provision to restrict Aversa from doing any and all business with the telecommunications giant AT&T.

So interpreted, the non-solicitation provision is not redundant of or inconsistent with the non-compete provision. Setting aside its geographic limitation, the non-compete language is very broadly directed to preventing a current or former employee from competing with Saturn in any way, shape, or form within the wireless industry. The non-solicitation restriction, by contrast, is limited to exploitation of Saturn's *actual, current* sources of business.

Second, Aversa argues, since leaving Saturn, he has never made the initial contact with an AT&T sales representative or an AT&T end-user with whom he previously had a relationship while at Saturn.

---

[8]     On the limited record, the Court does not make any decision as to the applicability of this language to individuals and entities in the non-AT&T 5% of Saturn's business.

Rather, he claims, the AT&T Sales Representatives and AT&T end-users with whom he has been in communication while at CCG (*see* Ex. P4) all contacted him first. (Def. Opp. 17–18, 26; Aversa Decl. ¶¶ 42–47) Therefore, Aversa concludes, he has not "solicited" any of Saturn's former customers, clients, vendors, or suppliers at all, let alone for the specific purpose of diverting business from Saturn. (*Id.*; *see* Restrictive Agreement § 2)

"Merely being in contact with former clients," in Aversa's view, "does not constitute solicitation." (Def. Opp. 17 (quoting *ING Life Ins. & Annuity Co. v. Gitterman*, No. CIV. 10-4076 DMC JAD, 2010 WL 3283526, at *4 (D.N.J. Aug. 18, 2010)). This argument falls flat. Aversa is relying on the title of the provision, not its substance; it is not limited to "solicitation," but also includes direct or indirect "contact." Surely being in contact with former clients—even if one is returning, rather than placing, a call—falls within the definition of "contact."

The case on which Aversa relies for this unconvincing proposition, *ING Life Ins. & Annuity Co. v. Gitterman*, interpreted a non-solicitation clause that did not prohibit "contact," but only actual attempts to induce current policy holders to cancel.[9] At any rate, *Gitterman* primarily turned on the insufficiency of the record evidence; the only evidence of solicitation the plaintiffs provided was an employee's affidavit containing vague and unsubstantiated assertions.[10]

---

[9]     The *Gitterman* clause restricted the financial advisor defendants from "advis[ing], induc[ing], or attempt[ing] to induce" clients who held annuities issued by the plaintiff company "to cancel, replace or allow to lapse" those annuities. *Gitterman*, 2010 WL 3283526, at *2.

[10]     Aversa also relies on *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, where a court in the Eastern District of Pennsylvania, interpreting a non-solicitation provision, looked to the dictionary definition of "solicit":

> To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain; and though

I do not accept Saturn's position that any contact with AT&T violated the agreement. But here, the evidentiary record establishes with a reasonable probability that, since leaving Saturn, Aversa has actually violated the non-solicitation provision as more narrowly interpreted by the Court.[11] It is of no significance that Aversa returned calls from, rather than placed calls to, AT&T sales representatives and AT&T end-users with whom he has worked since resigning. Nor is it relevant for this purpose whether Aversa acquired contact information for these individuals afresh or underhandedly held on to information he had from Saturn.

2.    *The non-solicitation provision may be reasonably enforced as to AT&T sales representatives and clients with whom Aversa worked when in Saturn's employ.*

I have an additional reason for adopting the limited interpretation of the non-solicitation clause outlined above. Even where the literal wording of such a clause would sweep broadly, public policy requires that I limit it so as not to unduly restrict the employee's ability to work in

---

the word implies a serious request, it requires no
particular degree of importunity, entreaty,
imploration, or supplication. To awake or incite to
action by acts or conduct intended to and calculated
to incite the act of giving. The term implies personal
petition and importunity addressed to a particular
individual to do some particular thing.

732 F. Supp. 2d 514, 520 (E.D. Pa. 2010) (quoting Black's Law Dictionary, p.1392 (6th ed. 1990)).

I do not dispute that this is an appropriate definition of "solicitation," but again, Aversa's reliance on *Meyer-Chatfield* ignores the critically broader term, "contact" in the non-solicitation provision to which he contractually agreed.

[11]    I make this finding without regard to Saturn's unsubstantiated and largely controverted argument that Aversa squirreled away Saturn's confidential information for weeks in advance of his resignation and then wiped his laptop and cell phone clean to cover his tracks. (See ¶¶ 35–40, supra; Compl. ¶¶ 29, 31; Sood Cert. ¶¶ 34, 38) I do, however, find persuasive Aversa's use of the same 561 phone number at Saturn and CCG, the intercepted e-mails between Saturn customers and Aversa, and of course Aversa's admission that he has in fact conducted or contemplated business with former Saturn customers, (see Ex. P4).

his chosen field.

Restrictive covenants, such as the non-compete and non-solicitation provisions in the Restrictive Agreement here, may be enforced. They must be scrutinized closely, however, because they stifle free competition and the individual's right to exploit his skills and labor. A non-solicitation provision is not valid if its sole purpose is to restrict competition, but it may be valid to the extent it furthers some other legitimate goal of the employer. *See Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970); *Whitmyer Bros. v. Doyle*, 274 A.2d 577 (N.J. 1971); *see also A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 432–34, 524 A.2d 412 (App. Div. 1987) (analyzing a non-solicitation clause under *Solari*, and recognizing *Solari* as "the seminal case").

Under the approach of the *Solari/Whitmyer* line of cases, a non-solicitation provision is enforceable to the extent it is reasonable under the circumstances of the case. *Karlin v. Weinberg*, 390 A.2d 1161, 1166 (N.J. 1978). A non-compete will be found reasonable if it "(1) protects the legitimate interests of the employer, (2) imposes no undue hardship on the employee, and (3) is not injurious to the public."[12] *Id.* (numbering added; internal quotations and citations omitted). *See also The Community Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (citing *Karlin*). Furthermore, New Jersey law authorizes the Court to modify, or "blue pencil" a restrictive covenant to a reasonable "scope of activity" if it crosses the line into unreasonableness. *Kadi v. Massotto*, No. A-2555-07T2, 2008 WL 4830951, at *8 (N.J. Super. Ct. App. Div. Nov. 10, 2008) (internal quotation marks and citation omitted).

Subject to certain "blue pencil" limitations, I find that the non-solicitation provision in Aversa's Restrictive Agreement is reasonable and likely to be found enforceable, because (a) it serves legitimate interests,

---

[12] Because of substantial overlap, I address whether this public interest prong at the same time that I address whether a preliminary injunction would be in the public interest. Section II(A)(2)(c), *infra*.

(b) imposes no undue hardship, and (c) is not injurious to the public.

### a) Saturn's Legitimate Interests

Saturn submits that the non-solicitation provision serves three legitimate business interests: (1) protection of trade secrets and other confidential information; (2) protection of the time and resources Saturn invested in Aversa's training; and (3) protection of "key relationships with AT&T team members built by Saturn over the past 16 years," and, by extension, Saturn's goodwill with AT&T's end-users.

Aversa replies that the non-solicitation covenant is unenforceable under the case law because Saturn has not articulated any confidential information it serves to protect; because the non-solicitation provision cannot restrain him from using skills he developed on the job, especially those he learned from AT&T, not Saturn; and because Saturn has not demonstrated that its customer relationships are so unique as to be proprietary. (Def. Opp. 21–24)

Aversa's arguments are not unfounded. He is correct that Saturn has failed to identify with specificity any trade secrets or confidential information, but has largely spoken in generalities about its relationships with AT&T sales representatives and the services it provides end-user customers. He is likewise correct that Saturn may not restrict Aversa from using skills that he acquired or developed while employed by Saturn. Nevertheless, Saturn *has* established legitimate interests in protecting a limited scope of confidential information as well as certain customer relationships and business goodwill.[13]

---

[13] Because Saturn has established both interests, I need not address Aversa's argument that the protection of confidential information is the sole valid basis for enforcement of a non-solicitation provision. I note, however, that either interest would likely be sufficient to render the non-solicitation provision enforceable. *See, e.g., Whitmyer Bros. v. Doyle,* 58 N.J. 25, 33, 274 A.2d 577, 581 (1971) ("[An] employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships."); *Solari*

## Trade Secrets and Confidential Information

New Jersey courts considering restrictive covenants "recognize as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations." *Campbell Soup Co. v. Desatnick,* 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (quoting *Ingersoll-Rand Co. v. Ciavatta,* 542 A.2d 879, 888 (N.J. 1988)). "[I]nformation need not rise to the level of a trade secret to be protected." *Lamorte Burns & Co. v. Walters,* 167 N.J. 285, 299, 770 A.2d 1158, 1166 (2001).

> [E]mployers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment.

*Ingersoll-Rand,* 542 A.2d at 894.

For example, in *Platinum Management, Inc. v. Dahms,* the court explained that "[t]he key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information." 285 N.J. Super. 274, 295 (Law Div. 1995). There, the defendant argued that the restrictive covenant the plaintiff sought to enforce unreasonably prevented the defendant from using names of customers that were already available in public trade directories. *Id.* But the court determined that other information—*inter alia,* the fact that customers were the defendants' customers; those customers' buying

---

*Indus., Inc. v. Malady,* 55 N.J. 571, 586, 264 A.2d 53, 61 (1970) (where plaintiff did not claim that the defendant, its former employee, jeopardized trade secret or confidential information but instead argued that the defendant threatened the plaintiff's customer relationships, the matter was remanded for final hearing with the suggestion that the defendant might be restrained for one year from dealing with plaintiff's actual or prospective customers with whom he had substantial dealings while in plaintiff's employ).

habits; and the plaintiff's merchandising plans, sales projections, and product strategies—*was* entitled to judicial protection. *Id.* 295–96. *See also Lamorte Burns & Co.*, 167 N.J. at 299 (discussing *Platinum Mgmt. Inc.* with approval).

On the other hand, "where customers are known in an industry or are easily discern[i]ble and personal contacts are taken from job to job, the rule is different," and customer information is not protectable. *Subcarrier Commc'ns, Inc. v. Day*, 299 N.J. Super. 634, 643, 691 A.2d 876, 881 (App. Div. 1997). This is reasonable, as "matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection nor will routine or trivial differences in practices and methods suffice to support restraint of the employee's competition." *Whitmyer Bros.*, 58 N.J. at 33–34.

Here, Saturn has failed to make a clear showing that Aversa possesses trade secrets or proprietary information concerning Saturn's business operations generally, or its business with AT&T specifically. As examples of Saturn's confidential solutions and strategies, Saturn submitted only publicly-available marketing fliers. (*See* Ex. D10) Sood testified at the hearing that Aversa's training in Saturn's solutions and strategies constitutes confidential information. She did not, however, articulate any examples or point to any written document that describes or memorializes the allegedly confidential information. She offered only generalities; a common refrain was Saturn's "secret sauce" being the key to its Platinum Champion status and competitive success.

Likewise, at her deposition, Sood testified that she was unable to "pinpoint" any confidential strategy Saturn sought to protect. She explained that Saturn's "confidential information" was passed along orally during employee training, but did not explain what it was. She stated that the essence of what Saturn considers confidential information consists of strategies for building relationships with AT&T sales

representatives. (*See, e.g.,* Ex. D12 pp. 79:25–81:9, 106:9–107:1) If any of this goes beyond standard salesmanship, it was not clear from the evidence. This evidence falls well short of establishing the type of purportedly confidential information New Jersey law considers worthy of protection. *Cf., e.g., Nat'l Reprographics, Inc. v. Strom,* 621 F. Supp. 2d 204, 226 (D.N.J. 2009) (finding restrictive covenant designed to protect proprietary and confidential information such as "knowledge of [plaintiff's] marketing plans, sales projections, product strategies, customer buying habits, and internal methods to bring profitability to the company.").

I have a different view, however, of any client-specific intelligence, such as the buying habits of Saturn's AT&T end-user customers or the solution and pricing preferences of particular AT&T sales representatives. That is specialized, confidential information that the non-solicitation provision legitimately serves to protect. "A competitor's knowledge of a particular customer's pricing and packaging requirements actually gives the competitor the ability to design for that customer's needs and to obtain an advantage over competitors who do not have this information." *Platinum Mgmt., Inc.,* 285 N.J. Super. at 295–96.

Aversa stresses that there is nothing confidential about the identities of AT&T's sales representatives; AT&T made contact lists available to any SP who asked for them. (*See* ¶¶ 34, 52, *supra*; Ex. D3) But Saturn submitted uncontroverted evidence that Aversa knew few if any AT&T sales representatives or AT&T end-users when he first joined Saturn. The evidence sufficiently established that Saturn invested substantial resources in helping Aversa build those business relationships. Especially at first, Sood routinely accompanied Aversa on meet-and-greets, and Saturn always paid for Aversa's marketing trips and expenses. (*See* Sood Cert. ¶ 22 & Ex. D). New Jersey courts consider this sort of expenditure of energy and money significant when

determining whether client information is worthy of protection. *See, e.g., Platinum Mgmt., Inc.*, 285 N.J. Super at 296; *A.T. Hudson & Co.*, 216 N.J. Super. at 434 (upholding non-solicitation agreement, noting that certain employers "expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff is able to attract represents a significant investment of time, effort and money which is worthy of protection.").

Aversa, on Saturn's dime, came to understand the business habits, preferences, and needs of AT&T sales representatives and AT&T end-users with whom he worked during his Saturn employment. This is more than general knowhow that an employee takes with him; it is not akin to "the tradesman who brings his tools to his employer and upon separation leaves with them, or a scientist who has entered into an employment relationship with a head full of scientific data which he used for the benefit of his employer and then may use for the benefit of another upon reemployment." *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 253 N.J. Super. 626, 637–38, 602 A.2d 789, 795 (App. Div. 1992). Rather, Aversa came to Saturn as a virtual blank slate, and through Sood's tutelage acquired protectable information critical to Saturn's success. And Aversa specifically acknowledged it as such when he signed the Restrictive Agreement. (*See* Restrictive Agreement ¶ 1 (defining Confidential Information)).

That said, a line must be drawn to ensure that Saturn's interest in protecting its confidential customer information does not encroach upon Aversa's legitimate use of his employable skills:[14]

---

[14]     *See Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 638, 542 A.2d 879, 894 (1988) ("The line between such information, trade secrets, and the general skills and knowledge of a highly sophisticated employee will be very difficult to draw, and the employer will have the burden to do so. Nevertheless, we do not hesitate to recognize what appears to us a business reality that modern day employers are in need of some protection against the use or disclosure of valuable information regarding the employer's business, . . .")

> While the employer has an interest in protecting
> its confidential information, the skills, expertise
> and know-how cultivated in the course of
> employment are not readily separated from the
> former employee's person. An employee therefore
> remains free to put his expertise to use "in any
> business or profession he may choose, including
> a competitive business with his former
> employer."

*Synthes, Inc. v. Gregoris*, No. CV 16-06255, 2017 WL 75786, at *6 (E.D. Pa. Jan. 9, 2017) (citing *Campbell Soup Co.*, 58 F.Supp.2d 477, 489 (D.N.J. 1999) (internal citation omitted) (applying New Jersey law). Indeed, "[i]t is a well settled rule of law that an employee, upon terminating his employment, may carry away and use the general skill or knowledge acquired during the course of the employment." *Boost Co. v. Faunce*, 17 N.J. Super. 458, 464, 86 A.2d 283, 286 (App. Div. 1952). "Information is not protectable when it is merely the knowledge, skill, or expertise learned or developed over an employee's career or tenure with the employer." *Nat'l Reprographics, Inc.*, 621 F. Supp. 2d at 226.

Accordingly, I find that Saturn has a protectable interest in the customer-specific information that Aversa learned by way of Saturn's investment, and which Aversa is no doubt tapping to secure business for CCG and Think Creative. But enforcement of the non-solicitation provision is reasonable only insofar as it is limited to restricting Aversa's business with the AT&T sales representatives and end-user customers *with whom he personally worked during his employment at Saturn.*

### Key AT&T Relationships and Customer Goodwill

Closely related is Saturn's interest in protecting its business goodwill. "Nonsolicitation agreements are designed to protect an employer's existing client base." *NASC Servs., Inc. v. Jervis*, No. CIV.A. 07-CV-5793DMC, 2008 WL 2115111, at *4 (D.N.J. May 19, 2008) Thus, for largely the same reasons articulated above, Saturn has demonstrated a legitimate business interest in protecting what the record shows is its

most valuable asset and investment: its long-fostered relationships with AT&T sales representatives and AT&T end-users. (*See* ¶¶ 7–13, 15–18, *supra*; *see also* Restrictive Agreement ¶1(a) ("Employee specifically acknowledges that [Saturn's] customer relationships were developed over many years, at great expense and effort by [Saturn]")) *See Ingersoll, supra*, 542 A.2d at 893; *Karlin v. Weinberg*, 77 N.J. 408, 417, 390 A.2d 1161, 1166 (1978); *A.T. Hudson & Co., supra*, 216 N.J. Super. at 433–34.

Aversa argues that Saturn has no protectable interest in its customer relationships because competition for AT&T's business among AT&T SPs is fierce, and AT&T has sole discretion to choose the SPs to which it will refer business. (Def. Opp. 23; *see also* ¶¶ 6, 12, *supra*; Alliance Agreement § 4.3) But Saturn's Platinum Champion status (*see* ¶ 17, *supra*), and (to some extent) the drop-off in Southeast region revenues following Aversa's resignation (*see* ¶¶ 57–58, *supra*) tell a different story.

Saturn's interest in protecting its customer base, if it were the only relevant interest, might suggest that Aversa could be ejected from this market altogether. But for the competing public policy reasons articulated above, that goes much too far. Saturn's *reasonable* interest in its customer relationships and goodwill from poaching by Aversa extends only so far as protecting the specific relationships that Aversa developed while at Saturn. Accordingly, this interest, too, supports "blue penciling" the non-solicitation provision to restrict Aversa from doing business with AT&T sales representatives and end-user customers *with whom he personally worked during his employment at Saturn.*

### b) Undue hardship

Aversa argues that enforcement of the non-solicitation provision would deprive him of his only source of business and livelihood, and therefore would impose an undue hardship upon him. (Def. Opp. 28) Aversa's argument loses much of its force, however, in relation to the non-solicitation provision as interpreted here. I have narrowed its scope

temporally, functionally, and (in effect) geographically. Aversa is restricted from working with his former AT&T sales representative and AT&T end-user contacts for one year. Assuming most sales representatives and customers have not relocated, this restricts Aversa's work only in the Southeast region.

Who are the representatives and end users with which Aversa is prohibited from doing business for a year? The only solid evidence of their identities is contained in Exhibits P3 and P3A. Those exhibits list the individuals and businesses with whom Aversa worked in the years 2015 and 2016. Aversa admitted at the evidentiary hearing that Saturn introduced him to all but (at most) one of the listed AT&T sales representatives. Saturn did not submit lists, and Aversa was not examined regarding his contacts in earlier years. I would find at any rate that Saturn's interest in protecting information about relationships prior to 2015 would be significantly diminished.

Although each covenant must be evaluated on its own terms, I note that similar non-solicitation provisions have routinely been upheld as reasonable. *See, e.g., Chemetall US Inc. v. Laflamme*, No. CV 16-780 (JLL), 2016 WL 885309, at *15 (D.N.J. Mar. 8, 2016) (restricting former employee "from soliciting (or assisting with the solicitation of) only his [former] customers for the two years prior to the end of his employment with the plaintiff]"); *Platinum Mgmt., Inc.*, 666 A.2d at 1040 (enforcing a restrictive covenant with a one-year term); *Coskey's Television & Radio Sales & Serv., Inc.*, 253 N.J. Super. at 638–39 (vacating overbroad preliminary injunction and instructing defendant's counsel, on remand, to prepare a form of preliminary injunction limiting the restrictive covenant at issue to "restrain[] [defendant] from interfering with any ongoing contract, including any modifications thereof, in which he had participated on behalf of [employer] during his employment.").

Saturn will have a year to consolidate the benefits of Aversa's relationships in which it specifically invested. In the meantime, Aversa

remains free to use the relationship-building skills and wireless-solutions knowhow that he developed at Saturn. In doing so, however, he must deal only with AT&T sales representatives and AT&T end-users not listed on Exhibits P3 & P3A. And of course he may freely pursue business with non-AT&T companies and clients. One year appears to be a reasonable time for Aversa's replacement, Greg Bocchino, to establish relationships and goodwill with AT&T sales representatives and clients in the Southeast region. Once that time has elapsed, Aversa may work anywhere and with anyone that he chooses. I am therefore satisfied that Saturn's non-solicitation is "narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *The Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 58–59, 869 A.2d 884, 897 (2005).

Courts evaluating the hardship prong have considered "the likelihood of the employee finding work in his field elsewhere." *Karlin*, 390 A.2d at 1169. As to that factor, the employee's own role in bringing about his hardship is important:

> The trial court should examine also the reason for the termination of the relationship between the parties to the employment contract. Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as "undue" in that the employee has not, by his conduct, contributed to it. On the other hand, where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself. Ordinarily a showing of personal hardship, without more, will not amount to an "undue hardship" such as would prevent enforcement of the covenant.

*Id.*; *see also More*, 869 A.2d at 898 ("If the employee terminates the

relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play.").

Aversa elected to resign from Saturn and immediately start a copycat business in his old Saturn territory. But that is not his only possible means of making a living. He testified that CCG is currently expanding to provide services in AT&T's wireline solutions space. While at Saturn, Aversa did not operate in the wireline area, a business which he now considers "a more complicated and profitable business than the wireless solutions space." (Aversa Decl. ¶ 41). He also stated that before becoming an AT&T SP, CCG initiated a relationship with a company called Intelysis, which would have given CCG "access to sell solutions offered by over 150 suppliers, including Ring Central . . . ." (*Id.* ¶ 39) Further, he is both the owner and "National Account Manager" of CCG (*id.* ¶ 3), and testified at the hearing that CCG provides services nationwide. Clearly, Aversa will have abundant opportunities for working and making a living in the solutions space over the next year, while still complying with the non-solicitation provision.

Aversa subjectively knew he was subject to the non-solicitation provision, as he testified to reading, understanding, and signing the Restrictive Agreement. (¶ 22, *supra*) For present purposes, it is not of primary importance whether Aversa retained Saturn's confidential information in advance of resigning, complied with Saturn's laptop and cell phone return policies, or initiated rather than responded to inquiries made by AT&T sales representatives. When he starting doing business with the same AT&T sales representatives and his former AT&T end-user customers within a year of resigning, he knew or should have known that he was potentially violating the non-solicitation provision. He simply took a chance that Saturn or a court would not enforce it. For this reason, too, any hardship Aversa may be suffering cannot be fairly characterized as "undue."

For all these reasons, the "hardship" factor weighs in favor of enforcing the non-solicitation provision.

c) Public interest

The public interest factor weighs in favor of enforcing the non-solicitation provision.

Aversa argues that "[i]nasmuch as the public interest always favors competition and abhors parties taking advantage of their own wrongdoing, it, too, favors the denial of the injunction." (Def. Opp. 28) But "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999) (no harm to public in prohibiting defendant from soliciting plaintiff's customers on behalf of a new employer where customers would still be free to choose the product it desires). *See also HR Staffing*, 2015 WL 5719655, at *5 ("While the public interest factor is not satisfied simply because enforcement of a contract provision is generally a good thing, we nevertheless agree that the public at large can be expected to gain from the enforcement of non-competes that make it possible for staffing agencies to continue performing their services for both employees and employers.") (internal citations and quotation marks omitted).

There comes a point, of course, when enforcement becomes so broad that it violates public policy, but I have narrowed the scope of the provision to take that into account. Within that scope, the public has an interest in protecting Saturn's confidential information and business goodwill. *See Ingersoll*, 542 A.2d at 894 (recognizing the public's interest "in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and techniques in which the employer may be said to have a proprietary interest.").

Additionally, the *Karlin* court identified two significant public interest factors a court should consider in determining whether to enforce a restrictive covenant: "the demand for the services rendered by the employee and the likelihood that those services could be provided by other [employees] already practicing in the area." *Karlin*, 390 A.2d at 1169–70 (*Karlin* involved a physician). As to these, my concerns are not significant. There is a substantial market and demand for the AT&T SP services Aversa provides, a demand that is served by hundreds of competing AT&T SPs. (¶¶ 6, 12, *supra*) The public will not be deprived of necessary services or even have its options significantly limited if the non-solicitation provision is enforced by preliminary injunction. *Cf., e.g., A.T. Hudson & Co.*, 216 N.J. Super. at 433–34 ("covenant not unreasonably injurious to the public" where "the record d[id] not indicate that customers experienced any real difficulty locating other consulting firms capable of rendering the same services as [defendant]").

Therefore, I conclude that the public interest prong weighs in favor of enforcing the non-solicitation provision, and doing so by preliminary injunction.

### B. Irreparable harm

Harm is considered "irreparable" if it is not redressable by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)). Saturn has the burden of proving a "clear showing of immediate irreparable harm" absent injunctive relief. *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 225 (3d Cir. 1987). *See also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21, 129 S. Ct. 365, 375 (2008) (holding it was error to water down the irreparable harm requirement from "likelihood" to "possibility," even where likelihood of success was strong).

Courts in the Third Circuit and this district recognize that the loss

of business opportunities and goodwill constitutes irreparable harm. *See, e.g., Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) "Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm."); *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *8 (D.N.J. June 15, 2009). ("[w]here an employee solicits customers of his former employer on behalf of his new employer," there is irreparable harm). Likewise, New Jersey courts recognize that "the diversion of a company's customers may [] constitute irreparable harm, [and that] [t]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages." *Fluoramics, Inc. v. Trueba*, No. BER-C-408-05, 2005 WL 3455185, at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005) (citation omitted).

Pointing to the steep competition among AT&T SPs for referrals and AT&T's sole discretion over where to send business, Aversa argues Saturn has not met its burden of showing irreparable harm because it is impossible for Saturn to show that CCG has "divert[ed] work or business from [Saturn]." (Def. Opp. 25–27) I disagree.

First, Aversa has been exposed to confidential information concerning the behaviors, preferences, and needs of Saturn's AT&T sales representative and AT&T end-user customers. (*See* ¶¶ 4, 13–15, 24, 33–35, 49–51, 53, 62, *supra*) At Saturn's expense, Aversa forged significant relationships and goodwill with these customers. (*Id.*) Record evidence demonstrates that, since resigning from Saturn, Aversa has completed or contemplated doing business with these Saturn customers for CCG and

Think Creative's benefit. (*See* ¶¶ 45–47, 55–56, 59–60, 62; Ex. P4) Surely some of these customers would, through Aversa, have given business to Saturn, had Aversa not left and pursued their business on CCG's and Think Creative's behalves instead. The precipitous decline in Saturn's Southeast region revenues since Aversa's departure supports this conclusion. (*See* ¶ 57, *supra*)

Taking this altogether, I find that Saturn has made a clear showing that Aversa's behaviors have started, and will continue, to immediately and irreparably harm Saturn by diverting certain confidential information, business opportunities, and goodwill to CCG and Think Creative.

If anything, the causal uncertainty on which Aversa relies—i.e., the difficulty in proving that any business opportunity Aversa now pursues with a former Saturn customer necessarily diverts business from Saturn—underscores the impossibility of ascertaining money damages. Likewise, the loss of goodwill Saturn would likely suffer if Aversa's diversion of business were to impact its preferred Platinum Champion relationship with AT&T cannot be quantified. And the relief must be preliminary relief, because the damage will be done (and the one-year period will have elapsed) by the time this Court is in a position to consider permanent relief.

Thus, the irreparable harm prong favors granting a preliminary injunction.

### C. Balancing the equities and the public interest

The final two prongs, balancing of the harms and the interest of the public, also weigh in favor of granting injunctive relief.

As I have explained in Section II(A)(2)(c), the public interest warrants enforcement of the non-solicitation provision in Aversa's Restrictive Agreement with Saturn.

I have also discussed Aversa's hardship in Section II(A)(2)(b),

*supra.* Within the next year, Aversa may solicit, receive, and conduct business anywhere and with any customers or clients other than the former AT&T sales representatives and AT&T end-users with whom he did business on behalf of Saturn in 2015 or 2016. These excluded individuals and businesses are listed in Exhibits P3 and P3A. The opportunities beyond these exclusions are vast. And, after one year, Aversa may solicit, receive, and conduct business with any individual or entity he wishes.

For the reasons discussed above, Saturn has a legitimate interest in keeping its customer-specific confidential information from competitors like CCG and Think Creative and in protecting its investment in customer relationships and goodwill. Equity therefore favors granting injunctive relief.

## III. SECURITY

Pursuant to the Federal Rules, this Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ." Fed. R. Civ. P. 65(c).

Therefore, I will require Saturn to give security in the amount of the portion of average annual salary Aversa earned at Saturn in 2015 and 2016 that is attributable to business he generated through the AT&T sales representatives and for the AT&T end-users listed in Exhibits P3 and P3A. Aversa will document that amount to Saturn, if necessary.

## IV. INJUNCTIVE RELIEF

In light of the foregoing, I will grant Saturn preliminary injunctive relief in an order providing as follows:

Defendant Frank Aversa shall be restrained, for a period of one year from the date of his resignation, November 15, 2016,[15] from violating the non-solicitation provision of his Restrictive Agreement with Saturn, such relief being limited to AT&T Sales Representatives and end-users identified in Exhibits P3 and P3A.

## V.    CONCLUSION

For the foregoing reasons, Saturn's motion for a preliminary injunction (ECF No. 3) is GRANTED. By Friday, April 21, 2017, after consultation with counsel for Aversa, Saturn's counsel shall

(1) submit a form of preliminary injunction, which shall specify the relief granted and include the amount of bond, which shall be posted within 30 days;

(2) propose redactions so that a version of this sealed Opinion may be filed publicly.

Dated: April 18, 2017

KEVIN MCNULTY
United States District Judge

---

[15] At the hearing, counsel for Saturn conceded that the one year period should run from that date. Any violation of the agreement thus far may be the subject of a claim for damages, however.